Good morning, ladies and gentlemen. Our first case for argument is Muhammad v. Del Pearson, Mr. Horowitz. Good morning, Your Honors. May it please the Court, may I begin? The case is a relatively simple case. It's one where there was some pretty clear black-letter law by this Court in the Jones case, which provides that when officers go into somebody's home pursuant to a search warrant, that search warrant has to describe the home with particularity. Yes, so we've got the facial ambiguity or the error in the warrant and the underlying affidavit. But on the other hand, we've got the officers, Pearson and Zuniga, saying that the CI had pointed out the apartment on the west side of the building. We've got the Leeds inquiry revealing that Tracy Jones lived in apartment 1A. We've got the deconfliction submission, which reflected that 1A was the apartment to be searched. Why isn't that additional information enough to show that Pearson's entitled to qualified immunity, even if the warrant fails in the particularity requirement? The black-letter law that the Seventh Circuit has established is if these particular pieces of information that Your Honor has just stated were submitted to the judge, magistrate or judge, then he would be off the hook. The defendant would be off the hook. But for example, you stated the west side. It wasn't stated in the search warrant, in the application for a search warrant, in Illinois' complaint for a search warrant, that it was the west side. All it says is that he pointed. So let me extrapolate on that argument for a moment. He pointed. It says he pointed. He pointed out the apartment, yes. So here we have a CI. Now what's a CI? A CI is usually somebody who has problems with the law that police officers convert into informants, right? And so if we have a scenario now where police officers are allowed to say, oh, well, wait a minute. I know what I said to the judge to get the search warrant, but this guy pointed this out to me. Now, I didn't tell you, judge, with particularity, which apartment it was. But I'm telling you that my street guy, who I can't give anybody the name to because he's a CI, he pointed it out. Now, if he would have said to the judge he pointed it out, that would have solved the problem. Looking at, for example, the, I'm going to forget the name of the case. One second. I'll give you the factual scenario and then I'll give you the name in a second. The recent Seventh Circuit case, the 2015 case, the McMillan case, there the police officer did a really interesting thing. He called up the judge and said, we've got a problem with the affidavit. We have one number wrong. Instead of 3888, for example, it's 3688. Six and eight, easy to make that mistake. He called up the judge and said, all right, thank you for giving me that information. Go on in. And then he went on it after he spoke to the judge. But it was a house. It was a house. And this house was well described as the Fourth Amendment requires with particularity. So there is no, well, the CI, whose name I can't give anybody, said it's that place in the multi-unit dwelling, which all cops know is confusing, meaning that you've got a multi-unit dwelling. They've got to do the homework. I took the officer's depositions and they said, you've got to go in and know what's going on. You've got to know exactly. Otherwise, you take off, you go home. That's exactly what the Seventh Circuit said in Jones. Ambiguity, don't go in. Stop. That's exactly what Jones said. In other words, we can't be doing post hoc analysis. The Fourth Amendment's prescriptions are fundamental. And a man's home or a woman's home, in this case the Jones home, it's their castle. Don't, government can't go in. And if they can go in, you've got to ask for a judge's permission. And then you've got to follow the judge's order exactly. That's the rule. And in other cases where there has been some leeway, it is, for example, where there's a house. And the house is also described with particularity. So, for example... But, you know, the cases do say that when the officer executing the affidavit knows the correct premises to be searched, that tends to eliminate any concern that the error or the ambiguity in the warrant might lead to a search of the wrong place. And that was true here, according to Officer Pearson. Doesn't his knowledge that it was Apartment 1A that was to be search addressed much, if not all, of your concerns? No. It cannot be. Because then it's a subjective test, and then we have problems. Because then, just like with the CI concept, an officer can say, well, this is what I knew. This is what I figured out. I'm sorry I didn't tell you, Judge, before I got my search warrant. I know I am the arm of the state when I execute a search warrant. But this is what I know. And cops can say they know whatever they know at any moment in time. So, no, I believe we cannot allow for that. Because if we do allow for that, then the exception begins to swallow up the rule, and there's no more rule. What exactly did the search warrant say about the location? So this search warrant said... First of all, it was for a gentleman by the name of Jameson Carr, who, by the way, was the neighbor. Neighbor was 1B, Carr. Our client was 1A. Carr, Jameson Carr, a.k.a. Momo, a male black, 28 years of age, 5 feet 8 inches tall, 140, medium build, black hair, and then there's an IR number. They come in, if I may extrapolate from that, may I follow up with that, or do you want me just to answer that question? So they go into the house, and they find four people, none of them named Jameson Carr. Now, this officer had a photograph of Jameson Carr. This shows the problem with all this post hoc analysis. He had a photograph of Jameson Carr. No Jameson Carr. I asked him at his desk, you got Jameson Carr? No Jameson Carr. Does he match? No, he doesn't. Why did you arrest him? Well, because he had bullets in his room. Because he had what? Bullets in his room, in the room that was occupied by my client and Marcus Muhammad and his girlfriend. So the police didn't think that he was Carr? No, they did not. They knew he was not Carr. That is correct. He had a photograph, so he showed the photograph. Since they were there, they thought they'd look around, is that the idea? That's how they found the bullets? Our position is they planted the bullets in order to justify their mistakes. They did what? Planted the bullets in order to justify their mistakes. That's what? If we went to trial, that's what I would say to the jury. Our client says, no bullets. There were no bullets. Well, even if we assume there were no bullets, no ammunition in the bedroom, many of the details that the CI provided were corroborated during the search, weren't they? Well, let me provide... Weren't they? They weren't his bullets, were they? No. Well, I guess, you know, there was human beings. I mean, I guess there were some things that were corroborated, Your Honor. Oh. But many things were not, and I want to draw you to the most interesting thing that was not. What Judge Norgel wrote in his decision, which was a corroborating piece of evidence, he said that in the complaint for the search warrant that the police officer said, that the CI said, there's a pregnant female in the room. This is the problem with the post hoc. There's no pregnant female in the room reflected in the complaint for the search warrant. Wait a minute. The girlfriend was pregnant in the room. Judge Norgel said that's what the complaint for the search warrant said. But the complaint for the search warrant didn't say that. He added the facts. In his opinion, he added the facts to the complaint for the search warrant in order to justify a result in favor of the officers. And I'm just giving you an example of, and I don't know if you're relying upon this fact, Your Honor, when you say there's corroboration, but... He's found sleeping in the back bedroom with his pregnant girlfriend. Yes. That corresponded to the CI's statement that Momo had sold her the crack cocaine in the presence of his pregnant girlfriend. CI told the police that an individual by the name of Tracy lived in the apartment. In fact, Tracy Jones did live there. Judge, I'm sorry. This is not from the complaint for the search warrant. If a police officer... I am talking about what the CI told him. It's not in the complaint for the search warrant. So, yes, the police officer said in his deposition that that's what the CI told him. Yes, Your Honor. And do we now accept that as fact? If we do, we're in trouble because police officers will say whatever they want to say in all cases of all breadth. Okay? From shootings occurring, where murders or where deaths occur, wrongful death lawsuits arise. So tell me this. If the apartment number on the warrant had been accurate, would the search warrant have met the particularity requirement, the street address coupled with the apartment number? Would that have been okay? I would say the answer is probably yes. I haven't analyzed that fact, and I hate to just off the cuff say yes, but I would say probably yes. Well, it would have left no uncertainty. That's correct. If it said 1A, it's apartment 1A at that address, I can't think of another issue. So, you know, it identifies the apartment as 1. And, of course, there's a 1A, there's a 1B.  And 1B, Your Honor, has Jamison Carr on the bell ringer. I'm sorry, it has the name Carr, not Jamison. No, it doesn't. It has Carr because it was his sister who lived there. That's a problem. Her name was Carr. That's a problem for the defense. Look, it's a very difficult case. You got up and said it's a simple case. No, I don't think it's simple. I think it's simple in the sense that I don't think it's difficult. Because you know it better than I do, that's why. So they arrested him and then released him. Yes. They take him into the station, pursuant to the idea, again, which is our problem, that there's bullets in his room, he says, okay, and we say no bullets in the room. He also said there was crack cocaine being dealt, no crack cocaine found. Also, guns were in. The CIA said guns were there. No guns were found. Nothing was found of a legal nature except for bullets. Did they apologize? Huh? Did the police apologize? Apologize to him for arresting him? I don't know. I think at some juncture there was somebody down at the station who said something.  I don't know if it arose to the level of an apology. I probably would remember that in the deposition if I secured that answer. I can tell you one thing that was problematic, inquiring about it. I said to him, why did you take him down to the station? And he's like, well, you know, sometimes people don't look the same in pictures. And that's a problem. That's a problem. Because he also said it's not him. My pictures make me look like Marilyn Monroe. I don't see why that would be a problem, Judge. Should I save time for rebuttal? Yes. Sure. Okay. Thank you very much, Mr. Lawrence.  Your turn to be tortured. Your turn to be tortured. Here's the complaint research warrant. May I hand it to counsel? May it please the court. First, I'd like to straighten out one misstatement of fact that counsel made. He said that the name of the confidential individual, that he could not obtain it. He never sought to depose that person. He never made a request for a deposition. The only reference that I found in the record is to a statement in the deposition of Officer Pearson in which they discussed the confidential informant. And Mr. Horowitz asked the name, and our counsel objected to giving the name at that point but made it very clear that she wanted to protect the confidential informant and that without a court order she wouldn't provide the name. That was the extent of her, the discussion concerning it, and Mr. Horowitz never followed up after that with a deposition. So it's quite unfair to say that the facts are all provided by our side. He could have obtained the confidential informant's deposition and learned exactly what she said. I thought his principal concern is the adequacy of the warrant. It certainly is, and he misstates what the black letter law is. The black letter law is at the very least that a mistake on the face of the warrant, including a misstatement of the address, is not fatal, and that whether the warrant is lawful depends upon other aspects of the warrant at the very least and some other circuits at least so far. Even that is not necessary as long as the officers who execute the warrant knew the location. In fact, in the McMillian case, those cases from other circuits that had that holding were endorsed. But did the police explain to the prosecutor, explain to the judge everything they knew about the situation, including their doubts? I don't have access to, I certainly don't know, there's no transcript in the record that I saw of the proceedings before the state court magistrate. That sounds like a serious deficiency. If the police don't tell the judge, magistrate, everything they know about the possible crime, how can the magistrate make a responsible decision? Well, there was significant information on the face of the complaint for search warrant, the affidavit, which was a description of the confidential informants, the event in which she allegedly purchased cocaine from Momo, the name of the person that she knew, and his pregnant girlfriend in the apartment in which Tracy Jones lived. All that information had been, now the face of the complaint for search warrant does not mention Tracy. The officer Pearson learned from his discussions with the confidential informant about Tracy and based on that, and he testified to that in his deposition, and that based upon his contact with Tracy, he did a lead search because Tracy's car had been outside the apartment and learned that Tracy lived in apartment 1A. And based on that, he obtained a deconfliction submission, or he made a deconfliction submission, and in that deconfliction submission, he mentioned the search warrant. Who does the deconfliction submission go to? The deconfliction submission is submitted to other law enforcement organizations. Not to the magistrate? No. Why isn't that done? I don't know why it's not done. It wasn't done. But won't those documents show that the police understood it was apartment 1A that was to be searched? I mean the leads inquiry and the deconfliction statement. They do, Your Honor, and they bound the police to search apartment 1A before the search occurred because they had announced before they did the search to all law enforcement agencies, we want to search apartment 1A in that building. Don't do anything that day. See, if there's a problem in the case, it's this. In the end, there's nothing in the warrant or the underlying affidavit that makes clear which of the two first-floor apartments was the apartment to be searched. For example, Pearson didn't specify in the complaint affidavit that the CI had pointed out the apartment on the west side. No, in the complaint for search warrant, Officer Pearson did specifically say that the confidential informant, when he drove the confidential informant to the building, she, quote, pointed to the apartment and identified it as the apartment where she met Momo and purchased the crack cocaine. Was it ever confirmed? I'm sorry to be interrupting you, but, I mean, for me, this is important. Was it ever confirmed that Jamison Carr had been selling crack cocaine in apartment 1A, or was the CI simply mistaken about which apartment the sale took place? No, neither of those is true. The CI was mistaken about Jamison Carr. She knew that Momo was the nickname, at least, of the person who sold her the cocaine. And Mohammed's nickname is Momo. And Mohammed's nickname is Mo, at least. And when, after speaking with the confidential informant, Officer Pearson, while speaking, looked at that address and found a picture of Jamison Carr stating that he lived in the building, he showed that picture to the confidential informant who said, yes, that picture of Jamison Carr is Momo. Now, the picture was of a person who was 5 feet 8 inches tall and was 28 years old. And the Momo, or at least Mohammed, whose nickname was Mo, was 5'5", 3 inches shorter, and was 21 years old, 7 years younger. At the police station, the police officers learned that Momo was not Jamison Carr, and there was no question about that. But again, prior to the search, the confidential informant told Officer Pearson that she had purchased cocaine from Momo and his pregnant girlfriend. But didn't you just say she had shown the police a photograph of him? No, the police had found a photograph, showed it to her, asked her whether that was Momo. She said yes. It turns out that it wasn't Momo. But since the police had this photo, when they went into the apartment, didn't they realize that Mohammed was not the person in the photograph? Well, they realized that they, I don't know. In fact, well, actually, I do know. The record specifically says that Officer Pearson realized that Momo, the person he saw in person, Momo, when he performed the search, did not look like Jamison Carr. But it was Momo. Well, I don't understand. They had a photograph, and they go into the apartment, and the person they see is not the person in the photo. That's correct. Well, doesn't that degrade the confidential informant's information? She said, this is the guy you're looking for. They go in with a photo, and it's not that person. No, she said. What's left of what the confidential informant said. She said that the person from whom she purchased was Momo. There's no doubt that Carr, the person in the picture, was not Momo. No, but I don't understand. Excuse me? This is what the police have, a photo of the person they think is in that apartment. Yes. And they go in, and it's not that person. And they arrest him anyway. Well, they arrest him anyway because his name was Mo. But he's not the person that the confidential informant said was the person who sold her the drugs. Well, they undoubtedly believed that she was mistaken about the picture depicting Momo. What do you mean? She thought this was one person and really a picture of someone else? Yes, because she'd given so much other information, and the other information was that. . . That may be so, but they didn't know prior to. . . Well, they. . . Pardon? They didn't know prior to the search that she wasn't reliable. In fact, the search warrant describes her. . . Well, why did they arrest this guy? Because they didn't have any information about him from her. Well, they had. . . That's all they have to go on. They had. . . Really clumsy police work. They had significant other information from her, which was before the search. Yes, but the photograph shows this is the wrong person. Right. That was the only information. . . That's critical. Well, that. . . They know it's the wrong person. They arrest him anyway. That was the only information in. . . They arrest him anyway, knowing he's not the right person. No, they don't know that it's not the right person. They know that it's not the. . . But she gave them a phony photograph, and they're going to act on that. She didn't give them the photograph. They found the photograph in their own record, showed it to her. She said, yes, it is. But she had also told them that the name of the person from whom she'd purchased it the day before. . . So it's complete confusion. And the police should have said, look, what is going on here? We have a name. We have a photo. What's what here? Because. . . What's their hurry? At that point, they had his name, Momo, as the person who had purchased it and his pregnant girlfriend. Look, the C.A. told Pearson that she had recently purchased four baggies of crack cocaine from Momo in the back bedroom in an apartment at 3236 East 92nd Street. And that's where they are. The C.I. had also seen a blue steel semi-automatic handgun on a table in the bedroom. The C.I. had a record of providing information that had led to the seizure of narcotics and three felony arrests in the previous three months. She was a reliable C.I. She identified a photograph of Jamison Carr, who was connected to the same address, the same address as Momo. And finally, she had pointed to the apartment where the purchase took place, and she had pointed to the specific door she'd gone into. So you do have a lot. Yes, you do. And they did not arrest anyone else, including the pregnant girlfriend. They did arrest Momo. They took him to the police station. They ascertained, still at that point, they didn't know that he wasn't Jamison Carr. They do discover that he's not Jamison Carr. How long was he in the police station? Fifteen minutes. Pardon? Fifteen minutes. And then they learned in the fifteen minutes that he wasn't. Right. So did they apologize to him? There's nothing in the record indicating what they said to him. They let him go quickly, but... Did they give him any money or something? There's nothing in the record indicating whether they gave him any money. But the officer had thought that he might arrest him for not having the... They're really big on police personal relations, aren't they? The police thought that they might arrest him for not having a FOID card, but they didn't arrest him. But they properly arrested him. They certainly had probable cause to arrest him for the sale of... Not if they had no business being in his apartment. Well, they had business being in... I don't think they did. Well, the connections to that apartment are... I think once they had the photograph, they needed to proceed more carefully. They needed to go back to the magistrate. Otherwise, they're just creating very bad relations between the police and a community of people who are already very suspicious of police. It's bad police behavior. They don't learn that the photograph doesn't match the face of the person whom they encountered, whose name was Mo, until after the arrest. Well, how is that possible? They have the photograph. There's the person standing there. No, the photograph, the confidential informant says, I purchased from Mo. The officers find a picture. The picture is of Jameson Carr. They show it to her. She says, that's Mo. They then find out that Tracy, whom the confidential informant had also told them lived in the apartment, lived in 1A. They then get a deconfliction submission indicating that they would search 1A. They then do search 1A, and for the first time, when they enter that apartment, Officer Pearson realizes that the photograph does not look to him like it was Momo, like the person in front of him, Jameson Carr and Momo. Before the search, there was nothing to indicate. Yeah, I know, but having seen that the photograph appears to be mistaken, the photograph supplied to them by the confidential informant, you'd think they'd back out because they don't know who this guy is. Well, at the point, they were already in the apartment once they matched it. Oh, great, they're in the apartment, so they have to arrest people. Yeah, once you're in the apartment, you've got to arrest the person. Even if it's their own person. Is that the idea? Well, they didn't see it. Is that how police think? No, once they were in the apartment. They're in the apartment. They have reason to think that the person there in the apartment is not the person who sold the cocaine to the CIA. No, they had conflicting information. They had reason to think that it might very well be a mistake. And they had just as more reason to believe that it wasn't a mistake. No, they didn't have more reason to believe. Well, the reason they had to believe that it was not a mistake is that the person whom they encountered was Momo, the same person who was listed on the complaint for search warrant and in the search warrant itself as the nickname of the person who sold them the cocaine, and that the purchase was made in the back bedroom and also with the pregnant girlfriend. And they encountered the pregnant girlfriend when they did the search. There's every reason to believe that the person whom they encountered, Momo, was the seller, even though he wasn't Jameson Carr. But of course it wasn't. It was a mistake. Well, it was not Jameson Carr, but it was the seller. Well, it was a mistake. It was the wrong person. Now, you're saying it was an innocent mistake. Well, no, it wasn't the wrong person. You're going to acknowledge it's a mistake, isn't it? They arrested the wrong person. Do you understand that, that they arrested the wrong person? No, I... Oh, you don't admit it. They arrested the criminal. He's the criminal. The person whom they arrested was Momo. They arrested the wrong person. Don't you understand that? They did not arrest the person who'd sold the cocaine to the confidential informant. No, they almost certainly did arrest the person who sold the cocaine. The person who sold the cocaine was Momo. That was clear. This guy, Mohammed, is not the person who sold the cocaine. Mohammed is the person who sold the cocaine. His name was Mo. That's the person who sold the cocaine. The mistake was the... Wait a second. You're saying this fellow, Marcus Mohammed, the plaintiff, was the seller of cocaine? Yes, he was the seller of the cocaine. And the mistake was the confidential informant's mistake. Was he prosecuted for that? No, as far as I know, he was not prosecuted for it. Why not? Well, there could be a variety of reasons. They may have needed him for other purposes. I don't know why he wasn't prosecuted. I'm not sure that he wasn't, but I don't think that he was. But they had every reason to believe that Mohammed, the person they had, was the person who made the sale. After all, he was paired with the pregnant girlfriend who was also, the confidential informant had also told Officer Pearson that that was the other seller, and they found both of them in the apartment, and Tracy, whom the confidential informant had also said lived in the apartment where the purchase was sold. All the facts indicate that the only mistake that was ever made in this case was the confidential informant's mistake in saying yes when she saw the police officer showed her the picture of Jameson Carr and said, is this Moe? And she said yes. Okay. Thank you. So Mr. Horowitz? Hi. Okay, so notably this factual exchange right now is a little messy, and we're messing around with and trying to understand the facts about what the police officer learned afterwards, and you're asking a lot of questions. Why? Because we're delving into areas that we're not supposed to be delving into. It is very similar to all the analysis that is done in Terry v. Ohio, Graham v. O'Connor, the probable cause test. It's not 20-20 hindsight with new facts. This is not how it is analyzed. That's not how Terry stops are analyzed. That's not how probable cause stops are analyzed. It's the Fourth Amendment. It's what you know upon entering, and that's the analysis. And, Your Honor, respectfully, you stated that the C.I. pointed out the door. She did not point out the door. Now, if we adopt post hoc evidence and we accept what the police officer said. Why do you say she did not point to the door? Pearson says she pointed to the door. Okay. You don't believe anything these police officers say. I'm sorry? You don't believe anything these police officers say. I worked long enough in this field, over 400 cases, that's correct. I've done 400 civil rights cases, police misconduct cases, and frequently I don't. Honey, I've done 4,000. Okay. But frequently I don't. That's correct. But nevertheless, let's assume what he said is accurate. Every case says, Your Honor, that he must present that fact to the judge. He's got to tell the judge that. And then the judge makes a probable cause analysis. That is the law. You're looking, Mr. Horowitz, you're looking for perfection. And there's not going to be perfection. These are very, very difficult cases. What we have to weigh here is what the facts are. Judge, respectfully, we do not weigh what the facts are as said by an officer in a deposition in a civil rights case about what transpired afterwards for him to justify and help and make better the defense of his case. That is not the analysis. That's not the analysis in a Terry case. That's not the analysis in a Graham v. O'Connor case. That's not the Fourth Amendment analysis. All of those are Fourth Amendment cases. The analysis is what was presented to the judge. And to be clear, just so you can appreciate sort of the messy quality of where we're at right now, the trial court, in the trial court's opinion, added facts that what we're talking about right now, he added facts to the complaint. In his opinion, he said that the criminal complaint for the search warrant said, for example, that there was a pregnant woman in the room, that the C.I. gave him that information. And he wrote that in there to justify and help substantiate the case. And, for example, that never happened. So you're saying that the judge also lied. No. The police lied. The judge lied. No, Judge, I'm not saying that. The city lies. Everyone lies. Well, I'm sorry. A lot of people do lie. But regardless of that, I'm not saying the judge lied, Judge. But it's not right. What else can I say? Well, what are you saying? Of course you're saying the judge lied. No. I'm saying that the judge wrote in his – well, I've already said it. The judge wrote in his decision what he wrote, and it's wrong. And sometimes judges borrow things and they create concepts and ideas in order to justify a position. This clearly happened because that's what occurred. He added facts that didn't exist. And he wrote that the C.I. – he wrote that what was written in the search warrant, what went to the magistrate judge, was that there was a pregnant woman in that room. And, oh, look, there and behold, there's a pregnant woman in the room. Oh, this is corroboration. Now it works. And so all Pearson now has to do and all any cop now has to do is say, this is what a C.I. – So are you saying that the fact that there was a pregnant woman in the room is not corroboration? When the C.I. said there's a pregnant woman in the room and there is a pregnant woman in the room, that's not corroboration? Let me say it this way. Where are we going here? Let me say it this way. In every case where a party prevails and a party loses, there's somebody who's just not telling the truth in some fashion or coloring the facts. If we accept – So it's not Momo, the drug dealer. It's Pearson, the officer. There is no evidence anywhere other than through counsel's mouth that Momo is a drug dealer. That is a made-up fact. He just said it. There's no evidence. It was never written by the trial court. It was never an accepted fact. It was never proven. Just as Judge Posner said, was he prosecuted for it? This was all made up by counsel, respectfully. No one ever said that. He just said it himself. There was a picture of Jameson Carr presented to the C.I. The cop looks at Jameson Carr. You're not the guy. So why are we accepting what fact? What scintilla of evidence is there other than a name? So his name is Muhammad and his nickname is Mo. It's not Momo, as counsel states. It's Mo. And there was a Momo. He did say it. He thought it was just Mo for sure. Well, I guess anybody could say – I'm sorry. The C.I. said Momo. She gave a different age, she gave a different height, off by 3 inches, different weight, and she did a photograph. I mean, what else can we – if we look at the totality of the facts, what else can we do where the cop walks in and looks at the guy and says, you're not the guy. And she says, that is the guy. I was supposed to ignore that and now call him a drug dealer? I mean, this is the kind of evidence that if we start extrapolating and doing all this post hoc stuff, people are in danger with all due respect. In this case, what happened is they took a battering ram and smashed a battering ram to the door about 20 times, a huge metallic battering ram, and smashed the door in. And it wouldn't even bust in. They had to come to the door to answer the door. This is what happened in my class. The CI told the police that Momo had sold her the crack cocaine in the presence of his pregnant girlfriend. The CI – it's ridiculous for me to go back through all this. That's not in the complaint for the search warrant. That is what the officer said in the deposition to defend the civil rights case. No search warrant is perfection, and that's what I fear you're looking for. Judge, the Fourth Amendment says with particularity. It says what it says. And many cases have – Yes, the particularity is a problem here. Well, right. And if you look at the McMillan case, which is – Did you say that they used a battering ram? Yes, Your Honor, they used a battering ram. On his door? Yes. There were four people in the home. So they broke the door? Well, they smashed it with a battering ram. It didn't break in because the door, I guess, was very strong and it resisted several officers taking a very heavy battering ram and smashing their door. So that is the entry. And then what happened was – So presumably the door was damaged? Yes, unless it's, you know – Did they replace it? I mean the police? I don't remember. Did they pay for the door? I don't remember. Because we had a case several years ago, a battering ram case, where the police accidentally battered down a neighbor's door. They were looking for a cocaine dealer. He was next door. They just made a mistake. They broke down the door. And then they apologized and they ran away to the other one. But a few hours later, a police lieutenant showed up and said, you know, we broke down your door by mistake, so we're buying you a new door. So did this happen here? No. No. Here's what the issue is. Let's just real quick. Okay. The issue is whether Pearson's knowledge – you may think he's a liar, but the judges believed him – coupled with evidence not referred to in the warrant and the underlying affidavit suffices to comply. Now, in the briefs, the parties acknowledged that many cases do say where the officer who signs the affidavit in support of the warrant is also the officer who executed the warrant, and the record shows that he knows which correct premises to search. The officer's knowledge tends to ally any concern that he might have searched the wrong place, whether by mistake, confusion, or sadly, even by design. Here, the evidence shows that Pearson did know the correct apartment, based on the CI having previously pointed out to him. Officer Zuniga confirms that. Moreover, there's no dispute that Pearson had the leads print out and deconflection submission in his position at time of search, and those documents specifically pointed to the correct apartment, 1A. Judge, I don't think so. I think with the deconfliction, first of all, no cases accept deconfliction ever. Not one reported case by anybody that information printed out through leads or whomever is an accepted piece of data for us now to analyze. Okay? No cases say that. Secondly, the deconfliction only says 1A and Tracy Jones was in there. It doesn't say Jameson Carr was in there, and it doesn't say that Marcus Muhammad was in there, so none of that is applicable. And so just one thing I'd like to leave you with is that by looking at it, so my red light is up, so do I stop? No, go ahead. Okay. So looking at it from a common sense point of view, and I took the depths of all the officers, you had a multi-unit dwelling. Confusion always creates confusion. What do you got to do? Get particularity. Why? Because in a multi-unit dwelling, you've got a first floor, and what's on the first floor? 1A, 1B, 1C, 1D. Don't mess up. Don't make mistakes. And in the Jones case where the Seventh Circuit opinion said that you can walk in and you can go to the right or you can go to the left, depending upon which staircase you take, the Seventh Circuit said, I am reversing the summary judgment granting against the plaintiff prevailed in summary judgment through the Seventh Circuit by reversing the lower court in that case because there was an ambiguity. Now, the officer may have known certain things or whatever, but there was a staircase and pursuant to the search warrant, he could have gone to the right or to the left and that sort of thing. And in the ‑‑ I want you to give me, please. Okay. We have to stop. May I just ask one more question? No. Have a good day. Thank you. Okay. Thank you very much to both counsel.